IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF 3.8873508 ETHER (ETH) STORED IN OR ACCESSIBLE AT COINBASE ASSOCIATED WITH THE LAW ENFORCEMENT SEIZURE WALLET OWNED AND OPERATED BY THE HAMPTON, NH POLICE DEPARTMENT | Case No.  25-mj-206-01-AJ |

**AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT**

I, Special Agent Virginia Toulouse, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with Federal Bureau of Investigation (FBI) and have been employed so since January 2016.  I am currently assigned to the FBI office in Bedford, NH. While employed by the FBI, I have investigated federal criminal violations related to, among other things, financial fraud investigations, including the use of cryptocurrency to facilitate these crimes.  I hold a Bachelor of Science degree in Accounting as well as a Masters of Accountancy. I am a Certified Public Accountant, licensed in the Commonwealth of Virginia.

2.      As an FBI Special Agent, I have received training and experience on how people use computers to commit crimes and the law enforcement techniques that can be utilized to investigate and disrupt such activity. I have also been involved in, among other things, numerous complex financial investigations involving the victimization of individuals and entities by frauds and swindles perpetrated by subjects over the Internet. Often in these investigations, victim proceeds of these frauds are laundered or transferred through cryptocurrency. Relatedly, in the course of my investigations and other cases on which I have worked, I have gained experience executing search and seizure warrants for physical premises, as well as for electronic evidence and data, including the content and other data associated with email, messenger, and financial

accounts, including cryptocurrency accounts. Additionally, I have received training in conducting cryptocurrency investigations, blockchain analysis, and use of blockchain analysis tools such as Chainalysis.

3.      The statements contained in this affidavit are based in part upon my experience, my knowledge of the facts and circumstances surrounding this investigation, and on information provided to me by other law enforcement personnel and other witnesses.  This affidavit is intended to show only there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

4.      This affidavit is submitted in support of an application for a combined criminal and civil seizure warrant for the following SUBJECT ASSETS:

> 3.8873508 Ethereum (ETH) stored in or accessible at Coinbase in a law enforcement seizure account owned and operated by the Hampton, New Hampshire Police Department (HPD) associated with user ID d01b01ca-0779-5a5f-8cb1-8eb6ed689fce in the name of "Joe Smith" with the ETH wallet address 0xF33AcE3Ef1b4272793F80dA08143746b28231203 ("0xF33Ac" or HPD WALLET).

5.      The SUBJECT ASSETS, and the manner in which the seizure is to be conducted, are further described in Attachments A and B, which are incorporated herein by reference.

6.      As set forth below, I submit there is probable cause to believe that the SUBJECT ASSETS are subject to forfeiture to the United States:

> a.   pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) because they are property involved in a money laundering transaction or attempted transaction in violation of 18 U.S.C. § 1956 and/or 18 U.S.C. § 1957, or are property traceable to such property;

b.  pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because they are property constituting, or derived from, proceeds traceable to one or more wire fraud offenses in violation of 18 U.S.C. § 1343 and/or a wire fraud conspiracy in violation of 18 U.S.C. § 1349; and

c.  pursuant to 18 U.S.C. § 982(a)(2)(A) as property constituting, or derived from proceeds obtained, directly or indirectly, as the result of a violation of 18 U.S.C. § 1343, or a conspiracy to violate 18 U.S.C. § 1349, affecting a financial institution.

7.  Money laundering, attempted money laundering, and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956 or 1957, wire fraud in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 are hereinafter collectively referred to as the SUBJECT OFFENSES.

## LEGAL AUTHORITY FOR SEIZURE AND FORFEITURE

8.  As to civil forfeiture, under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 18 U.S.C. § 1957], or any property traceable to such property" is subject to forfeiture to the United States.[1]

---

1    It is a violation of 18 U.S.C. § 1956(a)(1)(B)(i) to, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—knowing that the transaction is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]"

It is a violation of 18 U.S.C. § 1957(a), in the circumstances set forth in 18 U.S.C. § 1957(d), to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 derived from specified unlawful activity.

Pursuant to 18 U.S.C. § 1957(f)(1), a monetary transaction includes "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . . ."

9.      Additionally, under 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting a 'specified unlawful activity' (as defined in [18 U.S.C. § 1956(c)(7)]), or a conspiracy to commit such offense" is subject to forfeiture to the United States. Pursuant to 18 U.S.C. § 1956(c)(7)(A)— incorporating any act or activity constituting an offense listed in 18 U.S.C. § 1961(1) (except an act which is indictable under Title 31, Chapter 53, Subchapter II)—any act which is indictable under 18 U.S.C. § 1343 or 18 U.S.C. § 1956 constitutes a "specified unlawful activity."

10.     As property subject to civil forfeiture under 18 U.S.C. § 981(a), the SUBJECT ASSETS may be seized pursuant to 18 U.S.C. § 981(b).

11.     As to criminal forfeiture, under 18 U.S.C. § 982(a)(1), "[t]he court, in imposing sentence on a person convicted of an offense in violation of [18 U.S.C. § 1956 or 18 U.S.C. § 1957] shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

12.     Additionally, under 18 U.S.C. § 982(a)(2)(A), "[t]he court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate . . . [18 U.S.C. § 1343], affecting a financial institution . . . shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation."

13.     Additionally, under 18 U.S.C. § 981(a)(1)(C), applicable pursuant to 28 U.S.C. § 2461(c), "[a]ny property, real or personal, which constitutes or is derived from proceeds

---

Pursuant to 18 U.S.C. § 1956(c)(6)(A), a financial institution includes any financial institution as defined in 31 U.S.C. § 5312(a)(2) or regulations promulgated thereunder. Pursuant to 31 U.S.C. § 5312(a)(2)(J), a financial institution includes "a currency exchange, or a business engaged in the exchange of currency, funds, or value that substitutes for currency or funds[.]"

traceable to . . . any offense constituting a 'specified unlawful activity' (as defined in [18 U.S.C. § 1956(c)(7)]), or a conspiracy to commit such offense" is subject to forfeiture. Pursuant to 18 U.S.C. § 1956(c)(7)(A)— incorporating any act or activity constituting an offense listed in 18 U.S.C. § 1961(1) (except an act which is indictable under Title 31, Chapter 53, Subchapter II)— any act which is indictable under 18 U.S.C. § 1343 constitutes a "specified unlawful activity."

14.    As property subject to criminal forfeiture under 18 U.S.C. § 982(a)(1), 18 U.S.C. § 982(a)(2)(A), and 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the SUBJECT ASSETS may be seized pursuant to 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

15.    With respect to seizure, 21 U.S.C. § 853(f) provides that a court may issue a criminal seizure warrant when it "determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under [21 U.S.C. § 853(e)] may not be sufficient to assure the availability of the property for forfeiture . . . ."

16.    The Court should conclude that a restraining order under section 853(e) would be inadequate, because the SUBJECT ASSETS are currently in the custody of the state police, and need to be seized and placed into the federal forfeiture system so that their value can be preserved, for potential return to victims.

17.    As to civil forfeiture, as relevant here, the government's seizure of any property (other than real property and interests in real property, as addressed in 18 U.S.C. § 985) must be pursuant to a warrant "obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure" unless certain exceptions apply. 18 U.S.C. § 981(b)(1), (2).

18.     Pursuant to 18 U.S.C. § 981(b)(3), "[n]otwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under [28 U.S.C. § 1355(b)], and may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement."

19.     Venue for a forfeiture action is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in the District of New Hampshire.  Further, venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(B), 1395(a), which permit a civil proceeding for forfeiture to "be prosecuted in the district where it accrues or the defendant is found."

20.     Pursuant to 28 U.S.C. § 1355(b)(2), "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought as provide in paragraph (1), or in the United States District Court for the District of Columbia."

21.     For the reasons listed above, the United States seeks a combined criminal and civil seizure warrant authorizing law enforcement to seize the SUBJECT ASSETS and preserve them pending further forfeiture proceedings.

## **BACKGROUND ON CRYPTOCURRENCY**

22.     Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

a.    Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether (ETH), are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

b.    Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.[2]  Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.  Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place

---

[2] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.

to another can be printed or written on a piece of paper or other tangible object.
Cryptocurrency can be exchanged directly person to person, through a cryptocurrency
exchange, or through other intermediaries.  Generally, cryptocurrency is not issued by
any government, bank, or company; it is instead generated and controlled through
computer software operating on a decentralized peer-to-peer network.  Most
cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the
decentralized network, containing an immutable and historical record of every
transaction.[3]  Cryptocurrency is not illegal in the United States.

       c.      A <u>blockchain</u> is a digital ledger run by a decentralized network of
computers referred to as "nodes." Each node runs software that maintains an immutable
and historical record of every transaction utilizing that blockchain's technology. Many
digital assets, including virtual currencies, publicly record all of their transactions on a
blockchain, including all of the known balances for each virtual currency address on the
blockchain. Blockchains consist of blocks of cryptographically signed transactions, and
blocks are added to the previous block after validation and after undergoing a consensus
decision to expose and resist tampering or manipulation of the data. There are many
different blockchains used by many different virtual currencies. For example, Bitcoin in
its native state exists on the Bitcoin blockchain, while Ether (or "ETH") exists in its
native state on the Ethereum network. USDT tokens are issued on various blockchains
including, for example, the Ethereum network.

---

3 Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate
transactions, making it difficult to trace or attribute transactions.

d.      A <u>blockchain bridge</u> or <u>bridge protocol</u>, also known as a cross-chain bridge, is a software application that enables the direct transfer of assets/value across different blockchains (*e.g.*, from the Bitcoin blockchain to the Ethereum network). When a bridge protocol user initiates a transaction from one blockchain to another, the user specifies the number of coins or tokens (*i.e.*, the value) that the user would like to send from the originating blockchain to the destination blockchain.

e.      There are typically two ways that bridge protocols accomplish this transfer of value.

f.      The first way is through "locking" and then "releasing" coins or tokens. If a user is dealing with a lock-and-release style bridge protocol, then the bridge will lock (or hold) coins/tokens on the originating blockchain. Once those coins/tokens are locked, the bridge protocol will release from its liquidity pool coins/tokens of an equivalent value on the destination blockchain. If a user would like to go back from the destination blockchain to the originating blockchain, then the bridge protocol will use the same lock and release mechanism.

g.      The second way is through "locking" and "minting/burning" coins or tokens. If a user is dealing with a lock-and-mint/burn style bridge protocol, then the bridge will lock coins/tokens on the originating blockchain and then mint (or create) coins/tokens of an equivalent value on the destination blockchain. If a user would like to go back from the destination blockchain to the originating blockchain, then the bridge protocol will burn (or destroy) the representative coins/tokens on the destination chain and release the initial value back to the user on the originating blockchain.

h.    Bridge protocols are either unidirectional (*i.e.*, only allow for the transfer of value to specific blockchains) or are bidirectional (*i.e.*, allow for the transfer of value back and forth across blockchains).

i.    A <u>transaction hash</u>, also called a transaction ID, is a unique string of characters which identifies a specific transaction on the blockchain—akin to a serial number or accounting journal entry number. A transaction hash is assigned to a transaction when it is added to the blockchain, and it is generated by applying a hash function to the transaction details, including the sender's address, the receiver's address, and the amount of virtual currency being sent. Transaction hashes can be found on blockchain explorers and can be used to verify and track transactions.

j.    Bitcoin (BTC) and Ethereum (ETH) are both types of cryptocurrency. Payments or transfers of value made with BTC or ETH are recorded in a blockchain network. Cryptocurrency is stored in a virtual account called a digital wallet. Digital wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address of key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, 26-36 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key; the cryptographic equivalent of a password or PIN needed to

access the address. Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

k.     Although cryptocurrencies such as Bitcoin and Ether have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

l.     Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code[4] with the public and private key embedded in the code.  Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a

---

[4] A QR code is a matrix barcode that is a machine-readable optical label.

"recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase). I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

m.      Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies, including U.S. dollars. According to Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[5] Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law). From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account. As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC

---

5 *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guiadance/application-fincens-regulations-persons-administering.

protocols and often also advertise their ability to offer customers stealth and anonymity. These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1–2%).

n.      Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

**COINBASE**

13

23.     Coinbase Global, Inc. was founded in 2012 and is an American cryptocurrency exchange. Coinbase has over 100 million users, and is the largest U.S.-based cryptocurrency exchange as well as the world's biggest bitcoin custodian, as of 2024.

## N.EXCHANGE

24.     N.Exchange is a non-custodial cryptocurrency exchange swapping service. N.Exchange was incorporated in 2017 and has a registered office address of Suite 11, Penhurst House, 352-356 Battersea Park Road, London, England, SW11 3BY.

## BLOCKCHAIN ANALYSIS AND CHAINALYSIS

25.     Through blockchain analysis, law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open-source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

26.     The information contained herein is based, in part, on blockchain analysis using the commercial blockchain analysis tool Chainalysis. Commercial blockchain analysis tools supplement open source blockchain data by applying heuristics or manual investigations to enhance the process of blockchain analysis. A cluster (or grouping of addresses) in these tools is a collection of addresses where the tool vender assesses one entity controls them.

27.     Chainalysis was founded in 2014 and has since become a leading provider of blockchain analysis tools used by law enforcement and businesses. The company offers various products that help organizations understand cryptocurrency movements, assess risks, and comply with regulations. Chainalysis has been instrumental in solving high-profile cybercrime cases by helping authorities trace stolen funds back to criminals. The process involves using sophisticated algorithms and data visualization tools to map out transaction patterns on the blockchain. As cryptocurrencies continue to grow in popularity, the demand for Chainalysis services is expected to increase, enhancing the ability to monitor financial activities.

## FACTS SUPPORTING PROBABLE CAUSE

### Investigation Background

28.     This affidavit sets forth probable cause to support the seizure of the SUBJECT ASSETS.

29.     A resident of Hampton, New Hampshire (Victim 1), owned and controlled a personal account at the cryptocurrency exchange, Coinbase. The account held several different cryptocurrencies to include Bitcoin, Ether, and several others.   As of October 17, 2024, the wallet contained approximately $170,156.57 worth of cryptocurrency.

30.     On October 17, 2024, Victim 1 reported to the HPD that he had been the victim of an impersonation scam.

31.     Victim 1 reported that on October 16, 2024, at approximately 5:00 pm, he received a phone call from someone purporting to be from Google utilizing what was later determined to be a spoofed phone number appearing to belong to Google customer service. The caller explained to Victim 1 that an individual in Frankfurt, Germany was attempting to change the phone number associated with Victim 1's Gmail account. The caller directed Victim 1 to

comply with a Gmail account recovery process. Victim 1 followed the caller's instructions. Following the process, Victim 1 observed on his Google Account Security page that an unknown Google device had accessed his email. This unknown device was labeled as "Google Support" so Victim 1 believed that it was legitimate.

32.     Later that evening, at approximately 10:00 pm, Victim 1 received an additional phone call from a subject purporting to be from Coinbase. The phone number showing up in Victim 1's caller ID was also spoofed so it appeared to be the legitimate Coinbase customer service phone number. The caller said that he was from Coinbase and that someone from Frankfurt, Germany was trying to send funds out of Victim 1's Coinbase account. The caller explained to Victim 1 that Victim 1's Coinbase account had likely been compromised, and he would need to move the funds from the Coinbase exchange to a Coinbase wallet to safeguard them. Victim 1 followed the caller's instructions and transferred cryptocurrency valued at approximately $170,156.57 from his Coinbase exchange account into a Coinbase wallet. The scammer(s) who had access to the wallet immediately moved the funds to an external cryptocurrency address that was completely controlled by the scammer(s).

33.     As relevant here, the cryptocurrency transfer included 1.42169128 Bitcoin, which was then worth $95,898.82.

34.     HPD worked with the New England State Police Information Network (NESPIN) to trace the stolen cryptocurrency.

35.     In brief, NESPIN traced the stolen funds utilizing Chainalysis. Victim 1's stolen Bitcoin was routed through multiple wallets in the two weeks after the fraud (between October 17, 2024 and November 1, 2024).  A portion of the Bitcoin funds were eventually swapped for Ether. The following graph shows the trace of Victim 1's stolen Bitcoin.



36.     In my training and experience, the frequent movement of the stolen funds and conversion from one cryptocurrency to another cryptocurrency is emblematic of concealment money laundering, as it is designed to make it harder for law enforcement to trace and recover funds.

37.     Ultimately the trace revealed on or about November 1, 2024, external address 0x7Fe462D862a0D515D071B1ed6d791066a081B5A1 sent 3.8873508 ETH (the SUBJECT ASSETS), a portion of Victim 1's stolen Bitcoin that was converted to Ether, to N.Exchange, where it was subsequently frozen as a result of an N.Exchange Blockchain Analysis tool flagging the transaction as risky. The funds for this order originated from Railgun.ch, a "privacy exchange" which is considered high risk. The flag and subsequent freeze of the funds resulted in N.Exchange requiring Know Your Customer (KYC) information to release the frozen funds. The sender of the SUBJECT ASSETS refused to provide N.Exchange with KYC information

resulting in the funds remaining frozen as of June 27, 2025.  However, neither law enforcement nor N.Exchange were able to identify the sender's true identity.

38.     Due to the tracing, HPD applied for and obtained a state search warrant to seize the SUBJECT ASSETS from the N.Exchange cryptocurrency exchange.

39.     On July 17, 2025, the SUBJECT ASSETS were transferred to HPD's law enforcement seizure wallet at Coinbase (user ID d01b01ca-0779-5a5f-8cb1-8eb6ed689fce) in the name of "Joe Smith" with the ETH wallet address 0xF33Ac. As of this writing, the funds remain on balance in the HPD Coinbase account.

40.     The state courts are unable to return the SUBJECT ASSETS to Victim 1.  Federal law enforcement is cooperating with the HPD.  I am seeking this warrant to seize the SUBJECT ASSETS for the purposes of initiating a federal civil forfeiture action.

## CONCLUSION

41.     In summary, based on information derived from the foregoing investigation, there is probable cause to conclude that the SUBJECT ASSETS are subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) because they are property involved in, or traceable to, money laundering and money laundering conspiracy in violation of 18 U.S.C. §§ 1956 and/or 1957; pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because they constitute or are derived from proceeds traceable to wire fraud and wire fraud conspiracy in violation of 18 U.S.C. §§ 1343 and/or 1349; and pursuant to 18 U.S.C. § 982(a)(2)(A) because they constitute or are derived from proceeds obtained as the result of wire fraud and wire fraud conspiracy affecting a financial institution in violation of 18 U.S.C. §§ 1343 and/or 1349.

42.     I submit that this affidavit supports probable cause for a combined criminal and civil seizure warrant authorizing the seizure of the SUBJECT ASSETS.

43.     Because the warrant will be served on the HPD, which will need to take steps to effectuate the warrant at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully Submitted,

/s/ Virginia Toulouse
Virginia Toulouse
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on _____, 2025
September 22,

Andrea K. Johnstone
UNITED STATES MAGISTRATE JUDGE

**Attachment A**

**Description of Property to be Searched**

The location to be searched is the Hampton, New Hampshire Police Department (HPD) seizure wallet at Coinbase with user ID d01b01ca-0779-5a5f-8cb1-8eb6ed689fce in the name of "Joe Smith" with the ETH wallet address 0xF33AcE3Ef1b4272793F80dA08143746b28231203.

This warrant will be executed by serving the warrant on the HPD, which will then transfer the property detailed in Attachment B to an FBI cryptocurrency wallet.

**Attachment B**

**Description of Items to be Seized**

The items to be seized are 3.8873508 Ether (ETH).